[No. 1395.]

JESSE BROWN v. THE STATE.

1. BILL OF EXCEPTIONS—PRACTICE.—A defendant on trial objecting to any
order, ruling or decision of the trial court, is entitled to time in which to
prepare his bill of exceptions, whether he has one or more counsel.
2. EVIDENCE—NEW TRIAL.—See the opinion *in extenso* for evidence, and
for facts stated in an affidavit, which, in view of the evidence adduced,
entitled the defendant to a new trial.

APPEAL from the District Court of Falls. Tried below before
J. A. Martin, Esq., Special Judge.

The appellant was charged by indictment with the theft of a
horse, the property of Rufe Casey, in Falls county, Texas, on
the fifteenth day of July, 1881. His trial resulted in a verdict
of guilty, with a seven years term in the penitentiary assessed
against him as punishment.

I. N. Casey was the first witness for the State. He testified
that on or about the fifteenth day of August, 1881, he lived three
or four miles east of Marlin, in Falls county, on Sandy creek.
On the day before the alleged theft he borrowed the horse in
question from his brother, Rufe Casey, to ride into town. On
Monday, the fifteenth day of August, 1881, he rode the horse into
town, and *en route*, at about nine o'clock in the morning, at a

point near the railroad, he met the defendant.   The witness rode around some lumber yards to a rack in the rear of George White's store, where he securely tied the horse.   This rack stands on a street, at the edge of a sidewalk.   After securing the horse to the rack with a strong rope, the witness went to the store of J. & I. Lyons, to attend to some business matters.   He remained there for some little time, when, having finished his business, he returned to the rack where he had tied the horse, but the horse was gone.   He examined the rack and the vicinity of the place where the horse was tied, but could find no indications of his having broken loose.   The witness then instituted inquiries concerning the horse.   While the witness was thus engaged, the defendant, who was then standing in front of Rickelman's store, a distance of about one hundred yards from the rack, and about fifty yards from where the witness first met him, called out to witness:   "Halloo, Casey!   What is the matter?"   The witness replied that his horse was gone.   The defendant answered:   "No, I guess not," and asked the witness where he had hitched him.   The witness told him, and the two, at the defendant's suggestion, went to the rack together and examined it to see if the horse could have broken loose, and from there the defendant accompanied the witness all over town, making inquiries for the horse.

In the afternoon, when all search for the horse was abandoned, the witness, upon the defendant's suggestion, procured a number of postal cards, and wrote to the sheriffs of surrounding counties of the disappearance of the horse, giving an accurate description of him.   In this task the defendant assisted the witness.   The defendant told the witness to send no card to the sheriff of McLennan county, as he was going to Waco himself that evening, and would make all necessary inquiries, and, in accordance with such request, the witness sent no postal card to McLennan county.   The two thereupon separated, and the witness saw no more of the defendant that evening.   It was the impression of the witness that the defendant was at that time employed in Waco.

On his cross-examination the witness stated that he did not give to the defendant, or other person, his consent to the taking of the horse.   The witness was holding the horse for his brother, Rufe Casey, from whom the animal was borrowed.   The witness did not see the defendant take the horse.   He believed that the defendant knew the horse, and had previously worked him.

The witness testified that he had always been on good terms with the defendant until the latter started some evil reports about the family of the witness. The witness denied that he had ever said to George Hendricks, at any time or place, that he intended to send the defendant to the penitentiary if he had to swear a lie to do it.

In addition to his testimony as set out in the opinion of the court, Rufe Casey testified that he loaned the horse in question to his brother, Ike Casey, on the day before the animal was lost or stolen. While the witness was in Waco, his brother Tom came to him to prevail upon him, if possible, not to claim the horse from the party to whom the defendant had sold it, and to offer him pay for the animal. The witness bought the horse at an estray sale in June, 1880, and had used him continuously from that time until he disappeared. He was worth about thirty dollars. He never gave his consent to any one to take the horse from the possession of his brother, Ike Casey. Bad feeling exists between Ike Casey and the defendant. The defendant was at the house of the witness often, between the time of the purchase of the horse, and his disappearance, and the witness was satisfied that the defendant had used the horse once or twice, and knew him. The witness and the defendant were brothers-in-law.

Tom Casey, another brother-in-law to the defendant, and brother to Rufe Casey, testified that the day after Rufe Casey went to Waco to get his horse, the defendant requested the witness to go to Waco too, and prevail upon Rufe Casey not to claim the animal, and to tell him that if he would let the matter drop, he, the defendant, would pay him well. The witness reached Waco and found Rufe Casey just as he was proving his property. The latter insisted on taking his property, which he did.

R. B. Smith testified for the State that he lived in Waco in August, 1881. On the morning of the sixteenth day of that month the defendant sold him a gray gelding, for which the witness paid him seventeen dollars. In a few days the witness sold the horse to Mr. A. Darwin, who lived near Waco. Within the next two weeks, Rufe Casey came to the witness, making inquiries about the horse.

Hugh Poston testified for the State that he was in Waco on the sixteenth day of August, 1881, and on that day saw the defendant with the horse in question. The defendant said that he

had purchased the horse from a man named Blandy, and had paid thirteen dollars for him. The defendant was at that time working in a blacksmith shop in Waco, but his family were living in Marlin at Mr. Kirkley's. The witness and the defendant went to Marlin that day on the same train.

Jesse Martin testified, for the defendant, that he was at work on the railroad in Waco, in August, 1881. On the sixteenth day of that month, he met a man in Waco, riding a gray gelding, who said that his name was Blandy. He offered to trade the gray gelding to the witness for a pony, asking five dollars boot. While the two were talking the defendant came up and Blandy offered to sell him the horse for fifteen dollars. The defendant offered thirteen dollars for the horse, which was accepted. Blandy gave the defendant a bill of sale, written on the leaf of a pocket memorandum book. The bill of sale was here offered in evidence, and was identified by the witness as the one given by Blandy to the defendant. George Hendricks, and a stranger who was with Blandy, were present at the time. Blandy was a dark complexioned man, of medium size, with dark hair, beard and eyes. This was the first and only time that the witness ever saw Blandy. He could not describe the stranger. The defendant gave in payment for the horse a ten dollar bill, and three dollars in silver. The witness did not have the bill of sale in his hands, and had not seen it since the day it was written.

George Hendricks testified that he was present at a trade between the defendant and a man who called himself Blandy, in Waco, in August, 1881. Blandy sold the defendant a gray gelding, for which the defendant paid a ten dollar bill and three silver dollars. Blandy, who sold the horse, was rather a medium sized man, with light hair, light eyes and light whiskers. He had a stranger with him, whom the witness could not describe. This witness testified that, at the place and on the occasion indicated, Ike Casey, the first witness, told him that he intended to send the defendant to the penitentiary, if he had to swear a lie to do it.

The bill of sale from Blandy to the defendant was read in evidence, and Mr. Hall, of counsel for the defense, testified that the defendant gave it to him about the time of his indictment, and that since that time it has been in his, Hall's, possession.

The opinion sets out in full the affidavit of Rufe Casey, upon which the court holds that the appellant's motion for a new trial should have been sustained.

*Oltorf & Holland,* and *C. B. Pearre,* for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

HURT, J.   The appellant was convicted of the theft of a horse. Upon trial, the defendant excepted to the ruling of the court upon some question of evidence; what the question was the record fails to show.   The defendant requested time to prepare his bill of exceptions.   The court refused to grant the request, upon the ground that there were three attorneys representing the defense.   Defendant excepted to this and reserved his bill of exceptions.

Article 686, Code of Criminal Procedure, provides that "On the trial of any criminal action the defendant by himself or counsel may tender his bill of exceptions to any decision, opinion, order, or charge of the court, or other proceeding in the case, and the judge shall sign such bill of exception."   Under the rules prescribed in civil suits, in order that such decision, opinion, order or charge may be revised upon appeal, Article 358 of the Revised Statutes reads:   "When in the progress of a cause either party is dissatisfied with any ruling, opinion or other action of the court, he may except thereto at the time the same is made or announced, and at his request time shall be given to embody such exception in a written bill."

This seems to us very plain language, in regard to which there can be no mistake.   Evidently the defendant had the right to prepare his bill at the time, nor is this right affected by the fact that he had more than one counsel.

The State relied upon recent possession and the attempt by defendant to mislead the owner of the horse as to its whereabouts, for a conviction.

In order to prove that defendant misled the owner, the State introduced Rufe Casey, who testified on that point as follows:

"The next day after the horse was taken, I went out toward Jewett, Leon county, looking for him, when the defendant told me he had heard of such a horse in Round Rock, Williamson county.   I answered, 'that is too thin, Jess; my horse did not go in that direction.'   The defendant replied, 'well, if you want to know the truth about the matter, I bought your horse in Waco, and have sold him again.   I did not know at the time I bought him that he was your horse, else I would not have bought him.'   The defendant then said he did not want me to take the

horse from the man to whom he had sold him; that the man was an innocent purchaser, and if I would let the matter drop he, defendant, would pay me for the horse. I made no promises, however, and the next week I went to Waco to get my horse. I hunted for and found a Mr. R. B. Smith; after seeing him I hunted for and found Mr. A. Darwin, living near Waco, in whose possession I found my horse. I then proved ownership, and brought the horse home."

On defendant's motion for new trial the following affidavit of Rufe Casey is relied upon:

"This day came and personally appeared before me, the undersigned authority, Rufe Casey, who on oath says, 'that in the case of the State of Texas v. Jesse Brown, on the trial of said cause, he testified that something was said about the horse being heard from as going through Round Rock, but he did not intend to be understood as being positive that the defendant said the same or anything like it to witness; and further, witness says, that on mature reflection he is now of opinion that he heard his (witness's) wife say something about that, and not defendant. Witness further says that a day or two after he first heard that the horse was stolen he went east to Jewett, in Leon county, to hunt the horse, and returned in a short while, and when he returned he was informed by his wife that Jess. Brown had been to see him, and had left him word that he had purchased and sold in Waco a horse suiting the description of the one he had lost, and if he had known that the horse was witness's he would not have done so, but that if it was witness's horse he would pay him for him; that he did not think he could find the horse, as he thought the purchaser had traded him to some one who had carried him to Round Rock. Affiant further states that at the time the horse was stolen that he was not the owner of the horse, but that he had traded him to one W. W. Glover, and had received every dollar of the purchase price of the horse. Witness further states that on Tuesday morning, the sixteenth day of August, 1881, the day after the horse was said to be stolen, he was in Marlin with Ike Casey, and wrote some notices on postal cards, having received the postal cards from Ike Casey at the time. Witness further states that a bitter enmity existed and still exists between Ike Casey and defendant, and that he, witness, does not believe and has never believed that defendant is guilty of taking the horse as alleged; and feeling that the jury received a wrong impression from his evidence, that de-

fendant was endeavoring to conceal from witness the where-abouts of his horse, and the true facts concerning his possession of the same, when such was not the case, witness makes this affidavit that justice may be done in the premises. Witness states that he does not know that defendant knew this horse had been traded by him (witness) to Glover before he was stolen."

Did the court err, in view of the facts stated in this affidavit, in overruling the motion for a new trial? We think so, under the peculiar facts of this case. We find no other errors in the record.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered October 21, 1882.